IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA M. WILSON, | ) | CASE NO. 3:14-cv-01319 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Linda M. Wilson ("Plaintiff" or "Wilson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 20.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Wilson protectively filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on September 28, 2011.[1]  Tr. 49, 233-245.  She alleged a

disability onset date of February 15, 2009, (Tr. 49, 233, 240), and claimed disability due to

arthritis in the neck and back, migraines, high blood pressure, and arm pain. (Tr. 116, 134, 156,

166).  After initial denial by the state agency (Tr. 123, 156-162), and denial upon reconsideration

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/  (last visited 7/14/2015).

(Tr. 141, 166-179), Wilson requested a hearing (Tr. 191-192).  On August 15, 2013, Administrative Law Judge Ryan Glaze ("ALJ") conducted an administrative hearing.  Tr. 70-115

In his September 4, 2013, decision (Tr. 46-67), the ALJ determined that Wilson had not been under a disability from February 15, 2009, though the date of the decision.  Tr. 49.  Wilson requested review of the ALJ's decision by the Appeals Council.  Tr. 45.  On May 9, 2014, the Appeals Council denied Wilson's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A.       Personal, educational and vocational evidence

Wilson was born in 1957.  Tr. 62, 269.  She was 56 years old at the time of the hearing.  Tr. 78.  Wilson has a high school education.  Tr. 78.  Wilson lives with her boyfriend, with whom she has been in a relationship for 10 years, in a ranch style single floor home.  Tr. 79.  She retains the ability to drive.  Tr. 80-81.  She has worked in the past as a reservationist for a hotel, a bank teller, and was briefly self-employed in 2009 selling candles out of her home.  Tr. 336-338, 82-83.  Wilson's experience working in the banking business as a teller and loan processor dates back to 1975 and ends in 2008.  Tr. 336-338.  Her job responsibilities as a teller and loan processor included lifting boxes of files and supplies and required her to be standing or sitting for long periods of time.  Tr. 85-87.  Wilson has not been gainfully employed since 2009.  Tr. 81.  She did not have medical insurance at the time of the hearing but she did have insurance when she worked.  Tr. 79.

2

**B.      Medical evidence**

**1.  Treatment history**

On July 4, 2010, more than a year after her alleged onset date of February 15, 2009,

Wilson sought emergency room treatment for complaints of chronic mid-thoracic back pain.  Tr.

419.  Wilson indicated that the muscle relaxant she had been taking was not providing much

relief.  Tr. 410.  She believed her exercise activities may have aggravated her pain.  Tr. 419.

Wilson was discharged in good condition with a diagnosis of myofascial strain.  Tr. 421.

On November 29, 2010, Wilson saw Karol Zsarnay, NP, at Port Sylvania Family

Physicians, for blood pressure and chronic pain she was experiencing as a result of an accident.

Tr. 365.  Nurse Zsarnay's findings included generalized osteoarthritis of multiple sites, essential

hypertension, and cervicalgia.  Tr. 366-367.  Nurse Zsarnay's treatment recommendations

included medication, physical therapy, a heating pad, and exercise.  Tr. 367.

Wilson sought emergency room treatment for neck, back, and leg pain on April 8, 2011.

Tr. 394.  She had no edema in her extremities, her neurologic exam was within normal limits, her

reflexes were symmetric, senses were intact, and there was some tenderness on palpation in the

shoulder, lower back, and thigh areas.  Tr. 395.

Wilson followed up with Lisa Gill, also an NP at Port Sylvania Family Physicians, on

April 28, 2011, and reported having back pain for almost over a year which had been

exacerbated for two to three months when she started experiencing increased pain levels with

intermittent numbness and tingling in both legs.  Tr. 356.  Wilson stated that, during the month

of April, her pain level was 10/10.  Tr. 356.  While Wilson was "unable to work out like she had

been" she did not have difficulty walking.  Tr. 356.  The physical exam results remained

generally normal with full weight bearing status on both legs and normal muscle strength and

tone in both upper and lower extremities.  Tr. 357.  Nurse Gill noted that a recent MRI showed a

tear at L5-S1.  Tr. 357.  She assessed back ache and bulging lumbar disc.  Tr. 357.  She

recommended pain medication, and provided referrals to physical therapy, pain management,

and neurosurgery.  Tr. 356.

   Wilson attended a pain management consultation with Elizabeth Fowler, M.D., at St.

Luke's Hospital, on June 21, 2011.  Tr. 376-379.  Wilson complained of having lower back pain

for about two years, and reported that pain medication and physical therapy had helped her pain

but she was still experiencing pain that worsened with sitting or going from a sitting to a

standing position.  Tr. 376-379.  Further, Wilson reported that she thought she initially injured

her back three to four years prior when attempting to pick up a box and further aggravated it a

year ago when she fell on her way to the mailbox.  Tr. 376.  Wilson described the pain as a

cramping, aching, stabbing, sharp pain which was always present but varied in intensity.  Tr.

376.  Wilson stated that the pain was worst in the morning upon rising but physical therapy and

pain medication helped alleviate some of her pain.  Tr. 376.  Dr. Fowler recommended a lumbar

epidural injection, started Wilson on Neurontin, and advised Wilson to continue to decrease her

opioids.  Tr 378.  Wilson was afraid of proceeding with an injection and indicated she preferred

to wait and see how things progressed.  Tr. 378.  Wilson told Dr. Fowler that she would like to

start exercising on her own and that she felt physical therapy was no longer needed.  Tr. 379.

   On September 30, 2011, Wilson followed up with Nurse Gill regarding hypertension.  Tr.

362-364.  She also complained of constant episodes of moderate mid-back arthralgias that were

exacerbated by movement.  Tr. 362.  Nurse Gill's impression was osteoarthritis and degenerative

disc disease.  Tr. 364.  Nurse Gill noted that Wilson's pain control had been deteriorating.  Tr.

364. Yet, she still displayed a full range of motion, normal strength testing, with a normal gait. Tr. 364.

On October 24, 2011, Wilson was seen by Nurse Gill for follow up on back pain. Tr. 461-464. Wilson reported her symptoms were worsening and prolonged sitting aggravated her symptoms even further. Tr. 461. However, examination findings remained normal. Tr. 463. Nurse Gill reviewed and made changes to Wilson's medications and she recommended physical therapy. Tr. 463-464.

On November 3, 2011, Wilson was seen at St. Luke's Total Rehab to begin her suggested physical therapy evaluation. Tr 442. She reported tingling in her hands bilaterally, neck pain, migraines two-to-five times monthly, limited activities of daily living, disturbed sleep and an inability to work. Tr. 442. Wilson had a decreased range of motion in the lumbar and cervical spine, but intact lower extremity strength and reflexes. Tr. 443-444.

On December 16, 2011, Wilson saw Nurse Zsarnay and reported that her pain was beginning to improve as a result of the physical therapy and Vicodin prescription. Tr. 465. Her musculoskeletal and neurologic exams remained normal and Wilson's treatment plan of medication and physical therapy was continued. Tr. 469. By January of 2012, physical therapy records reflect that Wilson was showing improvement in her ability to perform activities of daily living and her overall pain was reduced. Tr. 478.

In March 2012, Wilson saw Nurse Zsarnay for a follow-up visit and completion of disability paperwork. Tr. 473-477. Her physical exam revealed a normal gait with no mobility limitations, but Wilson exhibited lumbar spine palpation tenderness at L4-5. Tr. 476.

In September 2012, Wilson reported to Nurse Zsarnay that her back pain had improved with the exercises given to her by physical therapy but she was not consistent with her exercises and had not gone to see a rheumatology specialist.[2]  Tr. 619.

During a follow up examination with Nurse Zsarnay on April 10, 2013, Wilson reported tingling in her hands along with pain radiating into her right leg and foot and pain in her right foot when standing on it.  Tr. 605.  A physical exam showed normal gait, no mobility limitations, and normal strength.  Tr. 607.  Nurse Zsarnay advised Wilson that regular exercise, including core strengthening, was important.  Tr. 608.  Nurse Zsarnay also advised Wilson that she was not a candidate for surgery and that spinal injections were realistic but Wilson refused to have them.  Tr. 608.  Wilson indicated a desire to continue physical therapy and remained in physical therapy until June 26, 2013.  Tr. 542-571, 608.  Nurse Zsarnay advised that, with physical therapy, Wilson may experience acute exacerbations for which Vicodin could be used.  Tr. 608.

During a June 28, 2013, visit with Nurse Zsarnay, it was noted that Wilson had "tried PT twice in the last 18 months which helped the first time but not the second…"  Tr. 596.  Nurse Zsarnay noted there might be a fibromyalgia component to Wilson's condition but she could not afford modern treatment therapies, such as Cymbalta, Lyrica, or injections.  Tr. 596. Prolonged standing and sitting exacerbated Wilson's pain and she was doing home exercises but it caused her pain to worsen later in the day.  Tr. 596.  She could not tolerate reaching and bending.  Tr. 596.  Her pain was limiting her ability to perform activities of daily living.  Tr. 596.  Flexion and extension in her lumbar spine was restricted and painful and palpatory findings included bilateral muscle spasms but Wilson's gait was normal, there were no mobility limitations, strength testing was normal, and a straight leg raise test was negative.  Tr. 599.

---

[2] Nurse Zsarnay had previously written a letter to Wilson's attorney explaining that she did not have access to specialists and/or different treatment plans due to a lack of insurance.  Tr. 523.

### 2. Imaging Studies

Wilson has had a number of imaging studies since 2010.  Tr. 397, 351, 348, 350, 354, 573.  Images taken of Wilson's lumbar spine on April 8, 2010, at St. Luke's Hospital emergency room by Rubina Shah, M.D., showed satisfactory bony alignment along with preserved vertebral body heights and disc space.  Tr. 397.  The bones did appear somewhat demineralized, and there was a "very slight" depression of the superior end plate at L4 and mild facet related arthritic changes were seen at L3-4 and L4-5.  Tr. 397.  Images of Wilson's cervical spine also taken on April 8, 2010, at St. Luke's Hospital emergency room by Rubina Shah, showed satisfactory bony alignment, preserved vertebral body heights, mild disc space narrowing at C3-4, 4-5 and 5-6, small osteophytes at C4-5, and the bones appeared somewhat demineralized.  Tr.  350.

An April 22, 2011, MRI of Wilson's lumbar spine revealed very subtle early disc desiccation at L3-4 and moderate disc desiccation at L5-S1 with a focal area of signal abnormality consistent with a localized annular tear and mild disc bulging.  Tr. 351.

A July 18, 2011, imaging study of Wilson's thoracic spine revealed normal alignment and no acute fractures or subluxations.  Tr. 348.  Wilson did have mild degenerative disc disease but her intervertebral disc spaces were preserved.  Tr. 348.

An October 13, 2011, lumbar spine MRI revealed "no significant change compared to the prior lumbar spine MRI" that had been done in April of 2011.  Tr. 354.  There was still a small annular tear at L5-S1 but no evidence of herniation, central canal stenosis, or neural foraminal narrowing at any level.  Tr. 354.  A thoracic spine MRI taken on the same day showed no acute thoracic spine abnormalities and no evidence of a cord compression but mild degenerative changes were seen, made evident by anterior osteophytes throughout the thoracic spine.  Tr. 355.

A March 2013 MRI of Wilson's lumber spine was consistent with the prior October 2011 MRI which showed posterior annulus tear at L5-S1 but no significant spinal stenosis or neural foraminal narrowing at any level.  Tr. 573-574, 354.

### 3.  Medical opinions—physical impairments

#### a.  Karol Zsarnay, N.P.

 Nurse Zsarnay treated Wilson on numerous occasions dating back to November 2010 through July 2013.  Tr. 365-367, 465-477, 596-626.   She authored two separate medical source statements (Tr. 525-531, 586-591), the most recent of which was completed on July 15, 2013, a month before the ALJ hearing was held.  Tr. 525-531, 586-591.

The first Medical Source Statement of Ability to do Work-Related Activities (Physical) was completed on March 22, 2012.  Tr. 525.  According to Nurse Zsarnay, Wilson's limitations included: sitting for 3 hours in an 8-hour workday, standing for 25-30 minutes in an 8-hour workday; walking for 2 minutes in an 8-hour workday; sitting for 10-15 minutes at one time without interruption; standing for 5 minutes at a time without interruption; walking for 30 minutes at one time without interruption and must change positions continuously; never lifting or carrying anything above 10 pounds, and occasionally lifting or carrying up to 10 pounds; only occasionally reaching, handling, fingering, feeling, pushing, or pulling with her hands; operating foot controls frequently; occasionally climbing ramps and stairs, balancing, kneeling, crouching, and crawling; never climbing ladders or scaffolds, or stooping; inability to perform individual activities like shopping; and inability to walk a block at a reasonable pace on rough or uneven surfaces.  Tr. 525-531.

On July 15, 2013, Nurse Zsarnay completed a second, updated, Medical Statement of Ability to do Work-Related Activities (Physical).  Tr. 586-591.  In this Statement, Nurse Zsarnay

now indicated that Wilson's limitations included: never lifting or carrying 10 pounds, sitting, standing, and walking each for 2 hours in an 8-hour workday, if divided; only lifting a half gallon; sitting for 15 minutes at one time; standing for 15 minutes at one time; walking for 20 minutes at one time; occasionally reaching and feeling with her hands bilaterally; frequently handling and fingering with her hands bilaterally; occasionally using her bilateral lower extremities for use of foot controls; never climbing ladders or scaffolds, balancing, stooping, kneeling, crouching, or crawling; occasionally climbing stairs and ramps; could not perform activities like shopping and could not travel without a companion.  Tr.  586-591.

### b.  State agency physician

On January 6, 2012, Maria Congbalay, M.D., reviewed Wilson's claim file and opined that the claimant retained the residual functional capacity to occasionally lift and carry 20 pounds, and 10 pounds frequently; sit for a total of 6 hours in an 8-hour work day; stand and/or walk for a total of 6 hours in an 8-hour workday; and push or pull within the limitations for lifting and carrying.  Tr. 120-122.  Dr. Congbalay also opined that Wilson would be limited to frequent climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing; occasional stooping, crouching, or crawling; and frequent kneeling.  Tr. 120-121. To support these conclusions, Dr. Congbalay noted that the "lumbar spine shows annular tear L5-S1; Cervical spine shows multilevel degen changes with spondylitic changes and some anterior effacement of thecal sac at C4-5 and C5-6. strength 5/5 throughout."  Tr. 121.  Also, Dr. Congbalay opined that Wilson should avoid concentrated exposure to hazards such as machinery and heights.  Tr. 121.

On April 30, 2012, Diane Manos, M.D., reviewed Wilson's claim file and concurred with the opinion of Dr. Congbalay.  Tr. 140-143

C.    **Testimonial evidence**

1.    **Wilson's testimony**

Wilson was represented and testified at the administrative hearing.  Tr. 78-103.  She

provided information regarding her personal, educational, and vocational background.  Tr. 78-88.

Wilson does not believe that she could do any of her past jobs in her current condition.  Tr. 87.

She said the focal point of her pain was in her back, and that she had been dealing with it for two

to three years with the worst pain occurring in the last three months.  Tr. 89.  She also

complained of tingling in her legs and leg buckling that was not improved by injections.  Tr. 89.

Wilson has not had surgery to repair her problems because she does not have insurance to cover

it and her current plan only allows for doctor visits.  Tr. 89-90.  The medicine she takes for her

pain is Vicodin, Ibuprofen, and Klonopin and she stated that "it takes the edge off" and allows

her to somewhat move throughout the course of the day, but it does not take all the pain away.

Tr. 90.  During a typical day, she takes breaks to lie down to try and relieve some pain, though

she still feels a tingling sensation.  Tr. 91.

On a typical day, Wilson gets up around 8:00, starts moving around at 10:00, and then

around 12:00 she will lie down and relax for an hour or two before she can get up and move

again.  Tr. 92.  She usually lies down for 3-4 hours a day.  Tr. 92.  When asked about why she

waited until 2011 to file her application when her alleged onset date was in 2009, Wilson stated

that she was still trying to work and she ignored a lot of her medical problems until she could not

handle them any more.  Tr. 94.  She quit her job as a bank teller in 2007 because the pain was too

much for her, and she went to work as a reservationist at a hotel.  Tr. 95.  She quit that job

because of a shortage of hours.  Tr. 95. She stopped looking for work shortly afterwards.  Tr. 95.

Wilson further explained that she was having numbness in her fingers in both hands and problems reaching out, stretching, and lifting her arms over her head.  Tr. 97.  Wilson claims to only be able to carry items weighing less than five pounds, and never able to use stairs.  Tr. 98.  She feels that the maximum distance she can walk before having to take a 15-20 minute break due to pain is half a block.  Tr. 99.  In an eight-hour work day, Wilson believes she could only walk two hours with breaks in between and could only stand for a few minutes at a time before needing to take a break.  Tr. 100.

On an average day, Wilson relies on her sister-in-law or her boyfriend to help with chores such as stripping the bed, doing laundry, cooking dinner, going to the grocery store, etc.  Tr. 101-102.  Wilson occasionally does a few dishes, light dusting or prepares microwavable meals.  Tr. 101.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Adolph Cwik testified at the hearing.  Tr. 103-113.  The VE created a vocational analysis of the record before the hearing.  Tr. 105, 345-346.  Following Wilson's testimony, the VE noted he wanted to make a change to that analysis.  Tr. 105.  He altered the physical exertional level of Wilson's loan processor job to light, as performed by her, because of the extra standing she did when performing that job.  Tr. 105-106.  The ALJ indicated he considered the loan processor and teller jobs to be Wilson's past relevant work and then presented the VE with hypothetical questions asking the VE to assume that the hypothetical individual was vocationally similar to Wilson.  Tr. 106-110.

In his first VE hypothetical, the ALJ asked the VE whether Wilson's past relevant work could be performed by an individual who could perform all functions of light work with the following limitations: frequently climb ramps and stairs, balance, kneel, occasionally stoop,

11

crouch and crawl; never climb ladders, ropes and scaffolds; and should avoid concentrated exposure to hazards such as unprotected heights, and dangerous and moving machinery.  Tr. 107. The VE indicated that the described individual would be able to perform Wilson's past relevant work.[3]  Tr. 107.  The ALJ then added to the hypothetical frequent feeling bilaterally and occasional overhead reaching.  Tr. 107.  The VE indicated that those additional restrictions would not alter his previous answer.  Tr. 107.

The ALJ then asked whether the individual could perform Wilson's past relevant work if she could only stand or walk 4 hours in an 8-hour day but only continuously for 30 minutes and who required the ability to sit or stand at will.  Tr. 108.  The VE did not believe that the hypothetical individual could perform the teller job because the worker would be required to stand when needed, rather than at will, but indicated that the loan processor job could be performed because there would be more flexibility.  Tr. 108.

The ALJ asked whether the individual described in the second hypothetical would be able to perform any other work in the national economy, in a light capacity.  Tr. 108.  The VE responded that the described individual could perform the following jobs: (1) administrative clerk, a light (semi-skilled) job with 2,117 positions available in Ohio and 58,832 available nationwide; and (2) file clerk, a light (semi-skilled) job with 3,174 positions in Ohio and 89,974 available nationwide.  Tr. 108-109.

The VE stated that a limitation of being off task more than 10 percent of the work day due to constant pain would preclude the jobs cited, as well as any other competitive employment in the U.S. economy.  Tr. 110-111.  The VE also indicated employers would generally tolerate only one unscheduled absence each month.  Tr. 111-112.

---

[3] With respect to the loan processor job, it would be as Wilson actually performed that job.  Tr. 107.

The VE was then examined by Wilson's counsel and asked whether the hypothetical person could do any of the outlined jobs if, during an 8-hour work day, she could sit for 3 hours, stand for 25-30 minutes, and walk for 2 hours.  Tr. 112.  The VE stated that those restrictions would not allow for competitive employment.  Tr. 112-113.  Wilson's counsel also asked whether a person who, in an 8-hour work day, could sit, stand, and walk for 2 hours each if divided, would be able to perform competitive employment.  Tr. 113.  The VE indicated that those restrictions would preclude competitive employment.  Tr. 113.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, she is not disabled.

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If the claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment,[5] the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 4, 2013, decision, the ALJ made the following findings:[7]

1.      Wilson met the insured status requirements of the Social Security Act through March 31, 2014.  Tr. 51.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[6] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[7] The ALJ's findings are summarized.

2.      Wilson had not engaged in substantial gainful activity since February 15, 2009, the alleged onset date.  Tr. 51.

3.      Wilson had the following severe impairments: degenerative disc disease of the lumbar spine with an annular tear, degenerative disc disease of the cervical spine, osteoarthritis, and a broad base disc bulge in the lumbar spine.  Tr. 51.

4.      Wilson had the following non-severe impairments: hypertension, obesity, migraine headaches, irritable bowel syndrome, exercise induced asthma, and depression.  Tr. 51-53.

5.      Wilson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments including listing 1.04, *Disorders of the Spine*, and Listing 14.09, *Inflammatory Arthritis.*  Tr. 53-54.

6.      Wilson had the RFC to perform light work with the following limitations: frequently climb ramps and stairs; frequently balance and kneel; frequent feeling bilaterally; occasional overhead reaching; occasionally stoop, crouch and crawl; never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to hazards, such as unprotected heights or dangerous and moving machinery, may only stand or walk four hours in an eight-hour day, but only continuously for thirty minutes, and the individual would need the ability to sit or stand at will.  Tr. 54-61

7.      Wilson was capable of performing past relevant work as a loan processor, a sedentary, semi-skilled job, light as performed by Wilson. Tr. 61.

8.      Wilson was born in 1957 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 62.

9.      Wilson had at least a high school education and was able to communicate in English.  Tr. 62.

10.     In the alternative, considering Wilson's age, education, work experience, RFC, and transferrable work skills that she had acquired from past relevant work, there were other jobs that existed in significant numbers in the national economy that Wilson could perform, including administrative clerk and file clerk.  Tr. 62.

Based on the foregoing, the ALJ determined that Wilson had not been under a disability from February 15, 2009, through the date of the decision.  Tr. 63.

## V. Parties' Arguments

### A.    Plaintiff's arguments

First, Wilson asserts that the ALJ erred in determining that Wilson had the RFC to perform modified light work.  Doc. 13, pp. 12-15. Wilson argues that the ALJ did not give the medical opinions of Nurse Zsarnay enough weight when considering the severity of her impairments.  Doc 13, pp. 12-15.  Wilson relies on SSR 06-03p which states that medical opinions of those who are not technically considered "acceptable medical sources" are important and should be evaluated on key issues such as impairment severity and functional effects.  Doc 13, p. 14. Wilson also contends that Nurse Zsarnay was the only examining source to offer opinions and, based on her longevity of treatment and being in the best position to properly assess Wilson's RFC, the ALJ should have given Nurse Zsarnay's opinions greater weight than the opinions of non-examining, reviewing acceptable medical sources.  Doc. 13 p. 15; Doc. 21, pp. 2-3.

Second, Wilson seeks a sentence six remand for consideration of medical reports from Port Sylvania Family Physicians (authored by Nurse Zsarnay) from October 11, 2013, (Tr. 637-640) and January 9, 2014, (Tr. 628-631) records that post-date the administrative hearing (August 15, 2013, Tr. 70) and the ALJ's decision (September 4, 2013, Tr. 46).  Doc. 13, pp. 10-11, 16; Doc 21, p. 3.  Wilson argues that the evidence is "new" because it was not before the ALJ, there was good cause for not presenting it at the ALJ hearing because the reports were not available at that time, and the reports are material because they show a greater severity of Wilson's condition than determined by the ALJ and thus provide a "reasonable possibility" of a different outcome.  Doc. 13, p. 16.

**B.     Defendant's arguments**

The Commissioner argues that the ALJ reasonably assessed Wilson's RFC and accommodated the limiting effects of her impairments by restricting her to "a materially reduced range of light work."  Doc 17, pp. 8-11.  Further, the Commissioner contends that the ALJ properly gave Nurse Zsarnay's opinions limited weight for the reasons stated in the ALJ's decision.  Doc 17, pp. 8-11.

Second, the Commissioner argues that Wilson has not met her burden of establishing that her new evidence is material as is required for a sentence six remand.  Doc 17, pp. 11-12.  The Commissioner contends that Wilson has not established that the additional treatment notes from Nurse Zsarnay would likely change the Commissioner's decision.  Doc. 17, pp. 11-12.  In particular, the Commissioner asserts that Wilson does not explain how the additional treatment notes include findings that are materially different from the extensive physical examination findings in the treatment notes that were in the record before the ALJ.  Doc. 17, pp. 11-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports Wilson's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.     The ALJ correctly assessed Wilson's RFC.

Wilson contends that the ALJ erred in assessing her RFC, arguing that the ALJ should have given greater weight to Nurse Zsarnay's opinions because of Wilson's long treatment history with Nurse Zsarnay and because Zsarnay's opinions are the only opinions from a "treating source." Doc. 13, pp. 12-15. However, the regulations define a "treating source" as a claimant's "physician, psychologist, or other acceptable medical source"[8] who has an ongoing treatment relationship with the claimant.  20 C.F.R. §404.1502.  Therefore, while Nurse Zsarnay, who is a nurse practitioner, may have had a treatment history with Wilson, she is not a "treating source" subject to controlling weight analysis under the treating physician rule.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor as an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record);  20 C.F.R. 404.1513(d) (examples of "other sources" include both nurse practitioner and chiropractor).

---

[8] Other "acceptable medical sources" include licensed optometrists, podiatrists, or qualified speech-language pathologists.  20 C.F.R. §404.1513(a).

Wilson argues that, although Nurse Zsarnay is not considered an "acceptable medical source" pursuant to SSR 06-03p, the ALJ was nonetheless required to evaluate her opinion using the same factors used to evaluate acceptable medical sources[9], and such an opinion may outweigh an opinion from an acceptable medical source.  Doc. 13, pp. 12-15; Doc. 21, pp. 203. With respect to Nurse Zsarnay's opinions, the ALJ stated:

> Limited weight is given to the opinion of Ms. Zsarnay. The undersigned notes that, although Ms. Zsarnay has a longitudinal treatment history with the claimant, she is not an acceptable medical source under the Regulations and presumptively lacks the requisite training and experience necessary to properly assess or diagnose an ongoing physical health impairment. Additionally the undersigned notes that the opinions of Ms. Zsarnay are inconsistent with her own treatment notes, which indicate that the claimant responded well to conservative treatment measures, and increased physical activities, such as stretching exercises and physical therapy. Moreover, the undersigned notes that Ms. Zsarnay's opinions are inconsistent with the opinions of the State Agency Physicans, who reviewed Ms. Zsarnay's treatment notes prior to formulating their opinions and suggested that the claimant could engage in work activity consistent with employment at the light exertional level. Based upon the foregoing, limited weight is given to the opinion of Ms. Zsarnay.

Tr. 59-60.

While Plaintiff argues that the ALJ failed to consider the evidence in accordance with SSR 06-03p, the foregoing demonstrates that the ALJ clearly considered Nurse Zsarnay's opinion and explained his rationale for the weight provided consistent with SSR 06-03p, which states: "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." 2006 SSR LEXIS 5, *12.  Factors the ALJ took into consideration in weighing the opinion evidence included the length and frequency of treatment, how consistent the opinion was with other evidence, and how well the opinion was supported by the evidence.  Moreover, Wilson has not

---

[9] These factors include (1) examining relationship, (2) length, frequency, nature, and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §404.1527(c).

shown that the ALJ's reasons for discounting Nurse Zsarnay's opinions are unsupported by the record.

As found by the ALJ, Nurse Zsarnay's opinions were inconsistent with her own treatment notes.  For example, Wilson's physical exam results found in Nurse Zsarnay's treatment notes dated the same day that Nurse Zsarnay completed her first Medical Source Statement (March 22, 2012) indicate that Wilson exhibited normal strength testing, a normal gait, and had no mobility limitations.[10]  Tr. 476.  Yet, Nurse Zsarnay opined that Wilson could only walk for two minutes total in an 8-hour work day, and stand for 25-30 minutes in an 8-hour work day.  Tr. 526.  These strict limitations conflict with the physical exam reported by Nurse Zsarnay in her treatment notes.  Tr. 476, 526.  Also, Wilson's physical exam results on March 11, April 10, and June 28, 2013, reflect normal gait, no mobility limitations, and 5/5 upper and lower extremity strength testing, results that are likewise inconsistent with Nurse Zsarnay's limitations in both her March 22, 2012, and July 15, 2013, Medical Source Statements.  Tr. 607, 599, 611, 525-530, 586-591.  Further, on several occasions, Nurse Zsarnay advised Wilson to participate in physical therapy or regular exercise  (Tr. 608, 469, 476, 534) and treatment records show Wilson responded positively to conservative treatment measures and increased physical activities like stretching exercises and physical therapy (Tr. 465, 517, 550, 596, 525-530, 586-591).

The ALJ also gave limited weight to Nurse Zsarnay's opinions because her opinions were inconsistent with the state agency reviewing opinions.  Tr 59-60.  Nurse Zsarnay's Statements were much more restrictive than Dr. Congbalay's Statement.  Tr. 120-121, 525-531, 586-591, 120-122.  Plaintiff does not dispute that Nurse Zsarnay's opinions are inconsistent with those opinions.  Rather, she contends that the ALJ erred because he gave more weight to the state

---

[10] Also, in her March 22, 2012, treatment notes, Nurse Zsarnay suggested Wilson begin a limited exercise program and walk for 10 minutes, 3 times a day.  Tr. 476

agency opinions than to Nurse Zsarnay's opinions.  Doc 13, pp. 14-15 (relying on cases arising out of the 11th Circuit).

This case, however, is not an instance where the ALJ scrutinized the state agency reviewing physicians' opinions any less than those of Nurse Zsarnay.  In fact, the ALJ did not give the state agency reviewing physicians controlling weight.  Rather, the ALJ gave them only partial weight.  Tr. 60.  One of the ALJ's reasons for doing so was that their opinions were inconsistent with the treatment notes of Nurse Zsarnay.  Tr. 60.  Further, while the limitations put forth by the ALJ's RFC are not as stringent as the ones set forth by Nurse Zsarnay in her latest Medical Source Statement, they are also not as lenient as the ones suggested by Dr. Congbalay and Dr. Manos.  Tr. 586-591, 120-122.  For example, Dr. Congbalay limited Wilson's sitting, standing and walking ability as follows: *stand and/or walk for a total of 6 hours in an 8-hour workday, and sit for about 6 hours in 8-hour workday*.  Tr. 120-121.  By contrast, the ALJ determined that Wilson had the RFC to perform light work as defined in 20 C.F.R. 404.1567 (b) and 416.967(b) but restricted Wilson further as follows: *may only stand or walk 4 hours in an 8-hour workday, but only continuously for thirty minutes, and the individual would need the ability to sit or stand at will*.  Tr. 54.  Clearly, the ALJ's determination of Wilson's RFC was made based on consideration of the entirety of the record, including the medical opinion evidence, and Wilson has failed to demonstrate that the weight assigned to Nurse Zsarnay's opinions was not fully explained or was unsupported by substantial evidence.

Accordingly, the undersigned finds that the ALJ's determination is supported by substantial evidence.  Thus, the Court must affirm it.

**B.      Wilson's request for a sentence six remand is not warranted**

Wilson has requested a sentence six remand for the purpose of considering evidence not presented to or considered by the ALJ.  Doc 13, p. 16; Doc. 21, p. 3. In particular, she requests remand for consideration of additional treatment notes from Nurse Zsarnay from October 11, 2013, (Tr. 637-640) and January 9, 2014, (Tr. 628-631), dates after the ALJ hearing (August 15, 2013) (Tr. 70).  Doc. 13, pp. 10-11.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was

"good cause" for his failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material."). Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted and emphasis supplied).

The evidence that Wilson seeks to have considered on remand consists of records dated after the August 15, 2013, administrative hearing.  Thus, because they were not in existence at the time of the administrative hearing, Wilson may be able to demonstrate that the October 11, 2013, through January 9, 2014, records are "new" and/or that she had "good cause" for not producing the records at or prior to the administrative hearing.[11]  However, even if Wilson can satisfy the "new" and "good cause" elements, she has failed to carry her burden of demonstrating that the new evidence is "material."

The extent of Wilson's argument as to the materiality of the new evidence is that it shows a greater severity of her condition than determined by the ALJ along with the continuation and

---

[11] As it pertains to the "good cause" element, even where the alleged "new" evidence was prepared following a final decision such that it could not have been presented at the hearing, a claimant must still demonstrate a valid reason for failing to obtain the evidence prior to the hearing.  *Oliver v. Sec'y of Health and Human Serv.*, 804 F.2d 964, 966 (6th Cir. 1986) (discussing *Willis v. Sec'y of Health and Human Serv.*, 727 F.2d 551, 554 (6th Cir. 1984)).

worsening of her symptoms after the ALJ hearing.  Doc. 21, p. 3.  She argues that "it is relevant to understanding the complete picture of plaintiff's condition and therefore there is a 'reasonable possibility' of a different outcome."  Doc. 21, p. 3.  Wilson does not explain these statements any further, nor does she demonstrate exactly how these new records would likely change the Commissioner's decision, or how they are materially different from the extensive physical examination findings that can already be found in the record before the ALJ.  Instead, the new treatment notes, for consideration of which Wilson seeks remand, reflect the same conservative treatment history of medication and physical therapy that is consistent with the rest of the record.  Tr. 628-631, 637-640.  Further, the physical examination findings in the new records are essentially the same as prior examination findings, which continue to document normal strength testing, negative straight leg raise tests, and a full range of motion of the cervical spine.  Tr. 631, 639-640.

It is Wilson's burden to establish that these new medical records are material, meaning that there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.  *Ferguson*, 628 F.3d at 276.  She has not done so. Further, a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  If Wilson's pain had seriously worsened after the administrative hearing, an appropriate remedy would be initiation of a new claim for benefits as of the date that her condition rose to the level of a disabling impairment.  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Based on the foregoing, Wilson is unable to demonstrate that there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore¸* 865 F.2d at 711.  Accordingly, Wilson is not entitled to a sentence six remand for the purpose of considering additional evidence not submitted to the ALJ.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  July 21, 2015

_____
Kathleen B. Burke
United States Magistrate Judge